2025-07671 | Case 3:25-cv-09071-WHO | Document 1-3 | Filed 09/02/25 | Page 1 of 20

I
Section 5
JURY

FILED
2025 AUG 06  P 02:03
CIVIL DISTRICT COURT

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

NO.: _____     DIVISION: _____

**GABRIELLE KARAM, SAMANTHA STEVENS, AND MEREDITH KARAM,
INDIVIDUALLY AND ON BEHALF OF
A CLASS OF SIMILARLY-SITUATED INDIVIDUALS**

**VERSUS**

**TEA DATING ADVICE, INC.**

FILED: _____          _____
                                            **DEPUTY CLERK**

### PETITION FOR DAMAGES

Plaintiffs Gabrielle Karam, Samantha Stevens, and Meredith Karam, (individually sometimes referred to as a "Plaintiff," and together, "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through undersigned counsel, hereby file this Complaint against Defendant Tea Dating Advice, Inc. ("Defendant" or "Tea"), upon personal knowledge as to those matters within their personal knowledge, and upon information and belief as to all other matters, as follows:

### PRELIMINARY STATEMENT

This is a class action lawsuit brought by Plaintiffs on behalf of themselves and all others similarly situated throughout the nation ("Class Members," together, the "Class") against Defendant for its failure to properly secure and safeguard personally identifiable information ("PII") and sensitive user data entrusted to it by users, as well for its fraudulent business practices and false claims.

On or about July 25, 2025, Defendant publicly acknowledged that it had experienced a significant data breach (the "First Breach"), through which unauthorized third parties accessed, exfiltrated, and potentially distributed the personal data of thousands—if not millions—of the users of an application known as "Tea App." The compromised information included sensitive details that users shared with Tea under the reasonable expectation of confidentiality and data protection.

Plaintiffs and Class Members provided their PII to Defendant in reliance on the company's representations that their data would be handled securely and in accordance with applicable privacy laws and standards. Tea failed to implement and maintain reasonable and adequate security measures to protect user data, thereby violating consumer trust and applicable state and federal data protection laws.

EXHIBIT 2

VERIFIED
Amber Sheeler
2025 AUG 06  P 03:04

E-Filed

2025-07671
I
Section 5
Case 3:25-cv-09071-WHO   Document 1-3   Filed 09/02/25   Page 2 of 20
FILED
2025 AUG 06  P 02:03
CIVIL
DISTRICT COURT

In direct contradiction to Federal Trade Commission Act, 15 U.S.C. § 45(a), Defendant fraudulently stated in its Privacy Policy that the images of its users it used to verify that the users were female were "immediately deleted" after the verification process was completed. This claim has been proven false by the Defendant's own admission that it retained, at least, 13,000 of its users' verification images—including photographs and copies of government issued IDs—for more than a year following the end of the verification process. Further, Tea took no steps to protect and secure this data from interception and use by nefarious third-party actors. Indeed, Tea stored these sensitive verification images in an unsecured Google Firebase storage bucket which was accessible to anyone with an internet browser.

In addition to the leaking of users' verification images, a second breach (the "Second Breach," together with the First Breach, the "Breaches"), which occurred just three days later on or about July 28, 2025, allowed unauthorized persons access to millions of private messages sent between users of the app. The Second Breach allowed third parties to view deeply personal and intimate conversations and is a direct result of Defendant's fraudulent practices and failure to protect user data.

As a direct and proximate result of Defendant's fraud and failure to safeguard user data, Plaintiffs and the Class have suffered injuries, including but not limited to invasion of privacy; increased risk of identity theft and fraud, emotional distress, humiliation, and stress/anxiety; loss of time and resources to mitigate the effects of the Breaches; intrusion upon seclusion; and a diminution in the value of their personal data, all manifesting in actual identity theft, fraud and/or phishing, cyber bullying, loss of money and costs incurred as a result of increased risk of identity theft, and loss of their PII, all of which have ascertainable value to be proved at trial.

Plaintiffs seek to hold Defendant accountable for its negligence, breach of implied contract, unjust enrichment, and violation of state and federal consumer protection and data security statutes. Plaintiffs, on behalf of the Class, seek injunctive relief requiring the Defendant to immediately pause its operations to implement improved data security practices. They also seek damages and any other relief the Court deems just and proper.

## BACKGROUND

Defendant Tea Dating Advice, Inc. operates the Tea App—a mobile application that purports to provide a safe and private space for women to share information about the men they date. On or about July 25, 2025, Tea publicly disclosed that it had suffered a massive data breach

that compromised the personal data, including photographs of users, and private communications of tens of thousands of its users.

The First Breach came just days after the Tea App surged to the top of the U.S. Apple App Store, following viral social media campaigns and increased public attention.[1] In response to this security incident, Tea took down portions of its app, disabled functionality, and began issuing public statements acknowledging the breach.

In its first official statement posted to its website and social media following the First Breach, Tea wrote:

> A legacy data storage system was compromised, resulting in unauthorized access to a dataset from prior to February 2024. This dataset includes approximately 72,000 images, including approximately 13,000 selfies and photo identification submitted by users during account verification and approximately 59,000 images publicly viewable in the app from posts, comments and direct messages.[2]

Despite this widespread access to private communications and verification photos, Tea assured the public that "no email addresses or phone numbers were accessed."[3] In this statement, however, Tea chose not to acknowledge that the home addresses and driver's license numbers of the users who submitted their IDs for verification are now easily accessible to the public. The company further attempted to downplay the First Breach by noting that only "users who signed up before February 2024 were affected."[4]

The First Breach was initially reported by 404 Media,[5] which revealed that sensitive private content—including images submitted for identity verification and user communications—was exposed and accessible to unauthorized third parties.

Despite its prior inconsistent representations, Tea claimed that the data was stored "in accordance with law enforcement requirements related to cyber-bullying investigations,"[6] though it failed to explain how or why this sensitive content remained vulnerable to access through legacy

---

[1] AP News, https://apnews.com/article/tea-app-dating-women-breach-messages-24c6e3ca6e8256f0594f80588607ba11, (last accessed 8/1/2025)
[2] TeaForWomen, https://www.teaforwomen.com/cyberincident?fbclid=PAZXh0bgNhZW0CMTEAAaewmxGUOSKNeqKDaq3Fchy5AjDJDaVjGNaB21swrdhITMYU1R6D7nICoPJvSw_aem_YoMjPA4mZ7POZsDTi_CbA, (last accessed 8/1/2025)
[3] See id.
[4] See id.
[5] AP News, https://apnews.com/article/tea-app-dating-women-breach-messages-24c6e3ca6e8256f0594f80588607ba11, (last accessed 8/1/2025)
[6] TeaForWomen, https://www.teaforwomen.com/cyberincident?fbclid=PAZXh0bgNhZW0CMTEAAaewmxGUOSKNeqKDaq3Fchy5AjDJDaVjGNaB21swrdhITMYU1R6D7nICoPJvSw_aem_YoMjPA4mZ7POZsDTi_CbA, (last accessed 8/1/2025)

2025-07671
I
Section 5
FILED
2025 AUG 06 P 02:03
CIVIL
DISTRICT COURT
E-Filed

Case 3:25-cv-09071-WHO    Document 1-3    Filed 09/02/25    Page 4 of 20

2025-07671

FILED
2025 AUG 06  P 02:03
CIVIL
DISTRICT COURT
E-Filed

systems. The retention of this information is also inconsistent with Tea's own privacy policy which, notably, has not been updated since 2022 and provides as follows:

> **Data Retention**
>
> We retain personal information we collect from You where we have an ongoing legitimate business need to do so (for example, to provide you with a service you have requested or to comply with applicable legal, tax, or accounting requirements). When we have no ongoing legitimate business need to process personal information, we will either delete or anonymize it or, if this is not possible (for example, because personal information has been stored in backup archives), then we will securely store personal information and isolate it from any further processing until deletion is possible.[7]

On July 29, 2025, a day after the Second Breach had been reported on, Tea provided an update to its official statement which revealed that even more sensitive content may have been accessed in the Second Breach.[8] In its website's FAQs section, Tea acknowledged:

> **I thought the selfies were deleted?**
>
> This data was originally archived in compliance with law enforcement requirements related to cyber-bullying prevention. At this time, we have no evidence to suggest that photos can be linked to specific users within the app.[9]

The Tea App's DM (Direct Message) system was fully disabled in the days following the Second Breach. Tea later stated:

> As part of our ongoing investigation, we have recently learned that some direct messages (DMs) were accessed as part of the initial incident. For this reason, our DM functionality is down.[10]

This information was also reported on its social media accounts:

---

[7] See id.
[8] TeaForWomen, https://www.teaforwomen.com/cyberincident?fbclid=PAZXh0bgNhZW0CMTEAAaewmxGUOSKNeqKDaq3Fchy5AjDJDaVjGNaB21swrdhlTMYU1R6D7nICoPJvSw_aem_YoMjPA4mZ7POZsDTi_CbA, (last accessed 8/1/25)
[9] See id.
[10] See id.

4



The data is believed to have included messages regarding abortions and cheating partners among other intimate and highly-sensitive matters, and contained phone numbers.

Importantly, Tea admitted that the Breaches occurred due to a failure to fully migrate legacy data during a platform update. In its FAQ section, the company conceded:

> During our early stages of development some legacy content was not migrated into our new fortified system. An unauthorized actor accessed our identifier link where data was stored before February 24, 2024.[11]

While Tea emphasized that it had "engaged third-party cybersecurity experts"[12] and was "working around the clock to secure [its] systems,"[13] the company has not explained why it continued to retain such sensitive images—including government-issued IDs—long after verification was complete and despite having alleged that it discontinued its ID requirement in 2023.

Tea also represented that "During our early stages of development, we required selfies and IDs as an added layer of safety to ensure that only women were signing up for the app. In 2023, we removed the ID requirement."[14] Yet Tea never informed its users that these IDs would be stored indefinitely, nor did it give users the opportunity to delete their verification images after

---

[11] See id.
[12] See id.
[13] See id.
[14] TeaForWomen, https://www.teaforwomen.com/cyberincident?fbclid=PAZXh0bgNhZW0CMTEAAaewmxGUOSKNeqKDaq3Fchy 5AjDJDaVjGNaB21swrdhlTMYU1R6D7nICoPJvSw_aem__YoMjPA4mZ7POZsDTi_CbA, (last accessed 8/1/25)

completing the signup process. Tea certainly did not warn its users that their sensitive verification images were being kept in an unsecured Google Firebase storage bucket that was publicly accessible.

The result was a catastrophic failure of cybersecurity coupled with a series of fraudulent statements intended to deceive its users and the public. Thousands of women—many of whom shared highly sensitive personal experiences on the platform—were suddenly made vulnerable due to Tea's inadequate security practices and its negligent retention of personal data.

Nefarious actors using the infamous imageboard known as 4-chan easily accessed the Tea App's users' sensitive PII and created interactive maps capable of providing geolocation coordinates, photographs of the users' homes, and even their personal images with a click of the mouse. See the following as an example:



These maps were widely disseminated on the internet and on platforms such as 4-chan, exposing users to significant economic harm, and also jeopardizing their personal, physical safety.

By the time of the Breaches, the Tea App had cultivated a public image as a trusted resource for female empowerment, confidentiality, and safety. Its tagline and promotional materials frequently emphasized "security" and "privacy" as foundational pillars of the platform. Tea's public-facing image, built around empowerment, confidentiality, and safety, was at odds with its failures to protect users' data. Users placed their trust in the Tea App to safeguard sensitive content, and Tea failed in that responsibility. The Breaches lay bare the cruel irony at the heart of the Tea App's failures: a platform that promised to help women protect each other from predatory men instead placed their most private information directly into the hands of the very predators it claimed

2025-07671
Section 5
Case 3:25-cv-09071-WHO   Document 1-3   Filed 09/02/25   Page 7 of 20

FILED
2025 AUG 06 P 02:03
CIVIL
DISTRICT COURT

to guard against, without employing so much as a password or encrypting the sensitive information.

In response to mounting scrutiny, Tea announced that it would offer free identity protection services to users whose personal information was compromised. However, the offer came only after public exposure and did little to prevent the harm suffered by the users of the Tea App. Tea's knowing retention of sensitive personal data, failure to adequately secure said data, and efforts to mislead users about the safety of their information has caused substantial damage to Plaintiffs and the over four million other users of the app.

## PARTIES

1. Plaintiff GABRIELLE KARAM is a resident of New Orleans and a citizen of Louisiana who downloaded, uploaded a verification image to, and used the Tea App in Orleans Parish. Ms. Karam is entitled to relief under the Louisiana Unfair Trade Practices and Consumer Protection Act, La. Stat. Ann. § 51:1401.

2. Plaintiff SAMANTHA STEVENS is a resident of Lake Charles and a citizen of Louisiana who downloaded, uploaded a verification image to, and used the Tea App in Calcasieu Parish in 2025, including by conversing via the app's private messaging system which messages, by means of the Second Breach of the app, have been made viewable by the public. Ms. Stevens is entitled to relief under the Louisiana Unfair Trade Practices and Consumer Protection Act, La. Stat. Ann. § 51:140.

3. Plaintiff MEREDITH KARAM is a resident of Lake Charles and a citizen of Louisiana who downloaded, uploaded a verification image to, and used the Tea App in Calcasieu Parish in 2025, including by conversing via the app's private messaging system which messages, by means of the Second Breach of the app, have been made viewable by the public. Ms. Karam is entitled to relief under the Louisiana Unfair Trade Practices and Consumer Protection Act, La. Stat. Ann. § 51:140.

4. Plaintiffs GABRIELLE KARAM, SAMANTHA STEVENS, AND MEREDITH KARAM are the proposed representatives for the Class Members.

5. The Class Members are similarly-situated individuals who downloaded, uploaded verification images to, and used and/or sent direct messages on the Tea App between 2023 and the present. Each user is required to upload an image for verification under the guise that it will be immediately deleted after verification. Defendant's negligence and fraudulent practices have

exposed potentially every user who went through this verification process to invasion of privacy, the increased likelihood of identity theft, as well as to having their intimate and private conversations made public. All of the Class Members are entitled to relief under applicable state and federal data protection laws.

6. Defendant TEA DATING ADVICE, INC. is Delaware corporation with its principal place of business located at 201 Spear Street, Suite 1100 San Francisco, California.

## JURISDICTION

7. Article V, Section 15 of the Louisiana State Constitution of 1974, vests the Civil District Court for the Parish of Orleans with jurisdiction over this civil matter.

## VENUE

8. Venue is proper in the Parishes of Orleans and Calcasieu, pursuant to the Louisiana Code of Civil Procedure, including Article 74. Some of the wrongful conduct and damages sustained by Plaintiffs and similarly-situated Class Members occurred within Orleans Parish.

## STATEMENT OF FACTS

### A. Plaintiffs' Narrative and Procedural History

9. Plaintiffs downloaded the Tea App in or around May of 2025, and then submitted verification images for Defendant to authenticate that they are female.

10. Prior to Plaintiffs' use of the Tea App, Defendant fraudulently claimed that their verification images would be deleted, and their personal information secured.

11. Defendant also represented that Plaintiffs' direct messages would remain anonymized, private, and secure.

12. Defendant's intentional misrepresentations led the Plaintiffs to use its product and resulted in their PII and sensitive user data being made public without their consent.

13. Despite Defendant being aware of its security failures by at least July 25, 2025, Defendant failed to take further precautions, and this negligence led to the Second Breach which impacted a much larger group of users than the First Breach.

### B. All Class Members Share a Similar Narrative

14. All Class Members share a similar factual narrative.

15. All Class Members were induced under a false narrative into sharing their personal images, PII, and sensitive information with the Defendant.

2025-07671   Case 3:25-cv-09071-WHO   Document 1-3   Filed 09/02/25   Page 9 of 20

FILED
2025 AUG 06  P 02:03
CIVIL
DISTRICT COURT

I
Section 5

16. All Class Members downloaded the app, uploaded a verification image of themselves, entrusted Defendant with the security of their PII, and fell victim to Defendant's fraudulent claims.

17. Defendant misled Class Members into believing their images would be deleted, their PII would be secure, that their direct messages would remain private, and that their identities would remain anonymous through their use of the app.

18. Upon information and belief, all Class Members' PII and direct messages have been accessed by nefarious third-party actors and disseminated across the internet without the Class Members' consent.

## CLASS ACTION ALLEGATIONS

19. Plaintiffs seek to have this matter proceed as a class action pursuant to Louisiana Code of Civil Procedure Article 591, *et seq.* on behalf of a Class of plaintiffs similarly situated, as Plaintiffs herein represent that they have causes of action and damages common to all those similarly situated who incurred damages arising from the Breaches of the Tea App, and/or negligent acts of defendant and/or other issues as may be proven upon trial.

20. Plaintiffs bring this action on behalf of themselves, and all other persons similarly situated, as representatives of the following proposed Class:

> All U.S. citizens who downloaded and used the Tea App prior to and/or at the time of the Breaches, including those whose images, PII, and/or direct messages were disclosed in the First Breach announced on July 25 and/or the Second Breach announced on July 28, 2025.

21. Plaintiffs reserve the right to amend this Class definition and/or add subclasses to include or exclude members of the Class.

22. This action is appropriate for determination through the Louisiana Class Action Procedure (La. C.C.P. Article 591, *et seq.*) for the following reasons:

**A.  Numerosity**

23. The exact number and identities of the Class Members are unknown at this time but may be ascertained through appropriate discovery and may be identified through the records maintained and possessed by Defendant.

24. Plaintiffs are of the information and belief that the persons in the Class of Plaintiffs clearly consists of, at a minimum, more than one hundred persons presenting a level of numerosity best handled through a class action procedure

2025-07671  Case 3:25-cv-09071-WHO    Document 1-3    Filed 09/02/25    Page 10 of 20

FILED
2025 AUG 06  P 02:03
CIVIL
DISTRICT COURT

I
Section 5

25.    Plaintiffs are so numerous, probably numbering in at least the thousands, that joinder of all members is impracticable. In the interest of judicial economy, this dispute should be resolved through the class action procedure.

26.    Upon information and belief, the individual members of the Class of Plaintiffs, or at least a large portion thereof, lack the means to pursue these claims individually.

**B.    Common Questions of Law and Fact**

27.    There are common questions of law and fact applicable to all Class Members and which predominate over individual questions, which include but are not limited to, (i) whether the Class Members' private messages, images, or PII that was entrusted to Defendant was accessed by an unauthorized third party; and/or (ii) whether Defendant misrepresented their privacy practices and procedures in their product's privacy agreement; and/or (iii) other questions of law and fact applicable to all Class Members.

28.    Answers to these common questions will resolve the question of damages shared by each member of the Class.

**C.    Typicality**

29.    Plaintiffs' claims against Defendant are typical and representative of those of all Class Members. Specifically, they were fraudulently enticed into agreeing to Defendant's terms, as with other Class Members; they uploaded verification images of themselves during the Tea App's verification process, as did the other Class Members; they sent private messages on the Tea App believing its contents and their identity would remain anonymous, as did other Class Members; and, upon information and belief, their claims are based upon Terms of Use and a Privacy Policy that are substantially the same, if not identical, to those agreed to by the other Class Members. Defendant's actions with respect to the Plaintiffs are typical of the Defendant's actions with respect to the other Class Members they seek to represent. Further, the claims of the Class representatives are not antagonistic to or in conflict with the claims of any putative Class Members.

**D.    Objectivity**

This Class may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the Class for purposes of the conclusiveness of any judgment that may be rendered in the case.

### E. Superiority and Predominance

30. The Louisiana Class Action Procedure affords a superior vehicle for the efficient disposition of the issues and claims herein presented, especially since individual joinder of each of the Class Members is impracticable.

31. A class action is a superior method for the fair and efficient adjudication of this controversy. Management of the claims of the Class is likely to present significantly fewer difficulties than those presented by many individual claims. The identities of the Class Members may be obtained from Defendant's records.

32. Individual litigation by each of the Class Members, besides being unduly burdensome to the plaintiffs, would also be unduly burdensome and expensive to the court system as well as the Defendant.

33. There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class Members. The questions include, but are not limited to:

   a. whether the Class Members were fraudulently led to believe their verification images would be deleted; and

   b. whether the Class Members' PII was negligently stored by the defendant and thereby accessed by an unauthorized third party.

34. This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of: a) inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the Defendant, and/or b) adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

35. Additionally, Defendant has acted and/or refused to act on grounds generally applicable to the Class, and/or questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, and/or a class action is superior to other available methods for the fair and efficient adjudication of this case, including but not necessarily limited to the following: a) the low interest of the members of the Class individually controlling the prosecution of separate actions; b) the lack of significant prior individual litigation by Class Members; c) the desirability of concentrating this litigation in this

2025-07671 Case 3:25-cv-09071-WHO   Document 1-3   Filed 09/02/25   Page 12 of 20

I
Section 5

FILED
2025 AUG 06  P 02:03
CIVIL
DISTRICT COURT

forum; d) the benefits and lack of difficulties in management of this matter as a class action; e) the lack of practical ability of individual Class Members to pursue their claims without the class action vehicle; and f) the cost, efficiency, and other benefits which justify this matter proceeding as a class action.

### F. Adequacy of Representation

36. Plaintiffs, the proposed Class representatives, will fairly and adequately represent and protect the interests of the members of the Class of Plaintiffs. Plaintiffs' interests are squarely aligned with those of individual members of the Class, and they are represented by skilled attorneys who have experience handling class actions, who have the resources to handle this class action, and who will handle this action in an expeditious and economic manner, all in the best interest of all members of the Class. Plaintiffs' counsel, Jones Swanson Huddell LLC, is experienced in class action lawsuits and complex commercial litigation.

## CLAIMS FOR RELIEF

### COUNT 1

#### Invasion of Privacy

37. Plaintiffs incorporate the allegations in the preceding paragraphs as if fully set forth herein.

38. Plaintiffs bring this claim individually and as representatives of and on behalf of a nationwide class.

39. By storing users' authorization images past their own explicit deadline, Defendant made an unreasonable intrusion upon Plaintiffs' and/or similarly-situated Class Members' physical solitude and/or seclusion.

40. By allowing public access to Plaintiffs' and/or similarly-situated Class Members' personal images and private messages, Defendant unreasonably disclosed embarrassing private facts and information unto the public.

41. Given that Defendant failed to encrypt user information, or even protect it with a password, Defendant's actions were unreasonable and seriously interfered with the privacy interests of the Plaintiffs and the similarly-situated Class Members. Plaintiffs and similarly-situated Class Members had a reasonable interest and expectation that Defendant would refrain from invading their privacy and/or protect them from third-party privacy invasions. Additionally, Defendant would not have been stopped, or even inhibited, from pursuing its course of conduct by

E-Filed

2025-07671 Case 3:25-cv-09071-WHO  Document 1-3  Filed 09/02/25  Page 13 of 20
FILED
2025 AUG 06 P 02:03
CIVIL
DISTRICT COURT

I
Section 5

adhering to its own policies or implementing a simple password to protect PII from nefarious third-party actors.

42. Plaintiffs and similarly-situated Class Members gave Defendant no authorization to invade their privacy and Defendant's actions were entirely unjustified given the circumstances.

43. By retaining possession of its users' verification images under false pretenses, and by allowing nefarious third-parties to access its users PII with ease, Defendant is liable for invasion of privacy under Article 1, § 5 of the Louisiana Constitution and, in the other states, whether it be through their constitutions, statutes, and/or the Common Law.

44. As a result of this invasion, Plaintiffs and similarly-situated class members have suffered damages including, but not limited to, humiliation, stress/anxiety, actual identity theft, fraud and/or phishing, cyber bullying, loss of money and costs incurred as a result of increased risk of identity theft, and loss of their PII, all of which have ascertainable value to be proved at trial.

**COUNT 2**

Negligence

45. Plaintiffs incorporate all previous factual allegations as if fully set forth herein.

46. Plaintiffs bring this claim individually and on behalf of a nationwide class.

47. Defendant knowingly collected, came into possession of, and kept Plaintiffs' and similarly-situated Class Members' PII, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, stolen, misused, accessed by, and/or disclosed to unauthorized parties.

48. Given that the users' PII was neither encrypted nor password protected, the breach and the subsequent harm to Plaintiffs and similarly-situated Class Members was entirely foreseeable to Defendant.

49. Defendant had a duty to have policies and procedures in place, and to act at all times in conformity with said policies and procedures, to detect and prevent the unauthorized access and/or dissemination of PII.

50. Defendant failed to provide adequate security for the data in its possession.

51. Defendant, through its actions and/or omissions unlawfully breached its duties to Plaintiffs and similarly-situated Class Members by failing to exercise reasonable care in protecting and safeguarding PII within Defendant's possession.

2025-07671 Case 3:25-cv-09071-WHO   Document 1-3   Filed 09/02/25   Page 14 of 20

FILED
2025 AUG 06  P 02:03
CIVIL
DISTRICT COURT

I
Section 5

52. Defendant's breach of duties owed to Plaintiffs and the Class proximately caused Plaintiffs' and similarly-situated Class Members' PII to be compromised.

53. As a result of Defendant's ongoing failure to notify consumers regarding the true extent to which and what type of PII had been compromised, consumers were unable to take necessary precautions to mitigate their damages by preventing future fraud.

54. Defendant's breaches of duty caused Plaintiffs to overpay for services, lose time monitoring their PII, diminish the value of the services they received, lose control over their PII, and caused the diminution in value of their PII.

55. Plaintiffs and similarly-situated Class Members are in danger of imminent harm that their PII, which is or may still be in the possession of third parties, will be used for fraudulent and illegal purposes.

56. Thus, in accordance with the Louisiana Civil Code, including article 2315, Plaintiffs aver that they are entitled to compensatory damages as a result of Defendant's acts and omissions.

57. Plaintiffs seek the award of damages on behalf of themselves and the Class.

58. By failing to secure Plaintiffs' and Class Members' PII, Defendant is guilty of fraud and/or malice, in that Defendant acted or failed to act with a willful and conscious disregard of Plaintiffs' and Class Members' rights, Plaintiffs therefore, in addition to seeking actual damages, seek punitive damages on behalf of themselves and the similarly-situated Class Members.

### COUNT 3

### Breach of Contract

59. Plaintiffs incorporate all previous factual allegations as if fully set forth herein.

60. Defendant, in processing, verifying, and authorizing users, required PII including images of the users and state and federal government IDs.

61. In providing such information, Plaintiffs and other similarly-situated Class Members entered into an implied contract with Defendant whereby Defendant became obligated to reasonably safeguard their non-public PII and other sensitive information.

62. Defendant breached the implied contract with Plaintiffs and similarly-situated Class Members by failing to take reasonable measures to safeguard their PII and other sensitive user data. Plaintiffs and Class Members suffered and will continue to suffer damages including, but not limited to, actual identity theft, fraud and/or phishing, cyber bullying, loss of money and

2025-07671    Case 3:25-cv-09071-WHO    Document 1-3    Filed 09/02/25    Page 15 of 20

I

Section 5

FILED
2025 AUG 06  P 02:03
CIVIL
DISTRICT COURT

costs incurred as a result of increased risk of identity theft, and loss of their PII, all of which have ascertainable value to be proved at trial.

## COUNT 4

### Unjust Enrichment

63. Plaintiffs incorporate all previous factual allegations as if fully set forth herein.

64. Plaintiffs and similarly-situated Class Members conferred a monetary benefit on Defendant by paying Defendant a subscription fee for the use of its product and/or by providing it with their PII.

65. Defendant has knowledge of such monetary benefit.

66. Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and similarly-situated Class Members, which Defendant has unjustly received as a result of its unlawful actions.

67. As a result of Defendant's conduct, Plaintiffs and the Class suffered and will continue to suffer actual damages including but not limited to, the release of their PII; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; and time spent initiating fraud alerts. Plaintiffs and similarly-situated Class Members suffered and will continue to suffer other forms of injury and/or harm including, but not limited to, other economic and non-economic losses.

## COUNT 5

### Violation of Federal and State Consumer Protection Laws

68. Plaintiffs incorporate all previous factual allegations as if fully set forth herein.

69. Plaintiffs and similarly-situated Class Members allege additionally and alternatively that the consumer protection laws listed below were enacted to protect consumers and promote fair competition in commercial markets for goods and services. Specifically, they prohibit unlawful, unfair, deceptive, and/or fraudulent business acts or practices.

70. As described herein, Defendant has engaged in unlawful, unfair, and deceptive business acts or practices.

71. Defendant's failure to disclose its substandard security practices substantially injured the public because it potentially caused millions of consumers to enter into transactions they otherwise would not have, and because it compromised the integrity of Plaintiffs' and the

similarly-situated Class Members' sensitive information. Further, Defendant's use of substandard security did not create any benefits sufficient to outweigh the harm it caused.

72. Accordingly, Defendant's inadequate data security measure practices and/or omissions regarding its data security and privacy-related practices constitute unlawful, deceptive, and unfair conduct in violation of The Louisiana Unfair Trade Practices and Consumer Protection Act, La. Stat. Ann. § 51:140, and the following illustrative State-specific consumer protection laws:

c. Alabama Unlawful Trade Practices Act, AL ST § 8-19-5, et seq.;

d. Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. §§ 45.50.471, et seq.

e. Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522;

f. Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-107–108;

g. California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq.;

h. California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.;

i. Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(1);

j. Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110b, et seq.;

k. Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, §§ 2513, et seq.;

l. Delaware Deceptive Trade Practices Act, Del. Code Ann. Tit. 6, §§ 2532(5) and (7);

m. Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq.

n. Hawaii Consumer Protection Act, Haw. Rev. Stat. Ann. §§ 480-2(a), et seq.;

o. Hawaii Deceptive Trade Practices Act, Haw. Rev. Stat. Ann. §§ 481A-3(a)(5), (7), and (12), et seq.;

p. Idaho Consumer Protection Act, Idaho Code Ann. §§ 48-603, et seq.;

q. Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. §§ 505/2, et seq.;

r. Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. Ann. §§ 510/2, et seq.;

s. Indiana Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-3(a), (b)(1), and (2), et seq.;

t. Iowa Consumer Fraud Act, Iowa Code §§ 714H.3 and 714H.5, et seq.;

E-Filed

2025-07671 Case 3:25-cv-09071-WHO   Document 1-3   Filed 09/02/25   Page 17 of 20

FILED
2025 AUG 06  P 02:03
CIVIL
DISTRICT COURT

I
Section 5

u. Kansas Consumer Protection Act, Kan. Stat. Ann. § 50-626(a) and (b)(1)(A), (D) and (b)(3), et seq.;

v. Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.170(1) and (2), et seq.;

w. Maine Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5, § 207, et seq.;

x. Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. tit. 10, § 1212(1)(E) and (G), et seq.;

y. Maryland Consumer Protection Act, Md. Code Ann. Com. Law, § 13-301(1), (2)(i)-(ii),(iv), (5)(i), and (9)(i), et seq.;

z. Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 2(a), et seq.;

aa. Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.903(1)(c), (e), (s), and (cc), et seq.;

bb. Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subd. 1(5), (7), and (13), et seq.;

cc. Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, subd. 1, and Minn. Stat. § 8.31, subd. 3(A);

dd. Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-1, et seq;

ee. Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, et seq;

ff. Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. §§ 30-14-103;

gg. Nebraska Consumer Protection Act, Neb. Rev. Stat. Ann. § 59-1602;

hh. Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. Ann. § 87-302(A)(5) and (7);

ii. New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2(V) and (VII);

jj. New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2;

kk. New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-2(D)(5)(7), (14), and 57-12-3;

ll. Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. § 598.0915(5) and (7);

mm. New York Business Law, N.Y. Gen. Bus. Law § 349(A);

nn. North Carolina Unfair Trade Practices Act, N.C. Gen. Stat. Ann. § 75-1.1(A);

E-Filed

oo. North Dakota Unlawful Sales or Advertising Practices Law, N.D. Cent. Code § 51-15-02;

pp. Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.02(A) and (B)(1) and (2);

qq. Oklahoma Consumer Protection Act, Okla. Stat. Ann. § 753(5), (7), and (20);

rr. Oklahoma Deceptive Trade Practices Act, Okla. Stat. Ann. tit. 78, § 53(A)(5) and (7);

ss. Oregon Unfair Trade Practices Act, Or. Rev. Stat. § 646.608(1)(E), (G), and (U);

tt. Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-2(4)(V), (VII), (XXI), and 201-3;

uu. Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1(6)(V), (VII), (XII), (XIII), and (XIV);

vv. South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, et seq;

ww. South Dakota Deceptive Trade Practices Act and Consumer Protection Act, S.D. Codified Laws § 37-24-6(1);

xx. Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. § 47-18-101, et seq;

yy. Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.46(A), (B)(5) and (7);

zz. Utah Consumer Sales Practices Act, Utah Code Ann. § 13-11-4(1) and (2)(A), (B), and (I);

aaa. Vermont Consumer Fraud Act, 9 Vt. Stat. Ann. Tit. 9, § 2453(A);

bbb. Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196, et seq;

ccc. Washington Consumer Protection Act, Wash. Rev. Code RCW §§ 19.86.010, et seq.;

ddd. West Virginia Consumer Credit and Protection Act, W. Va. Code Ann. § 46A-6-104;

eee. Wisconsin Deceptive Trade Practices Act (and Consumer Act), Wis. Stat. § 100.18, et seq; and

fff. Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-105(a), (i), (iii), and (vv).

## DAMAGES

73. As a result of the Breaches, Plaintiffs and members of the Class of similarly-situated individuals have suffered and are entitled to recover the following non-exclusive damages:

ggg. invasion of privacy;



hhh. increased risk of identity theft and fraud;

iii. emotional distress, humiliation, and stress/anxiety;

jjj. loss of time and resources to mitigate the effects of the Breaches;

kkk. intrusion upon seclusion, and

lll. a diminution in the value of their personal data;

all manifesting in actual identity theft, fraud and/or phishing, cyber bullying, loss of money and costs incurred as a result of increased risk of identity theft, and loss of their PII, all of which have ascertainable value to be proved at trial.

## JURY DEMAND

74. Pursuant to Louisiana Code of Civil Procedure Article 893, Plaintiffs aver that the claims asserted herein exceed the requisite amount for this matter to be triable by a jury, and, to that end, hereby demand a jury trial.

## PRAYER

WHEREFORE, in light of the foregoing, Plaintiffs, individually and on behalf of a Class of similarly-situated individuals, pray that:

mmm. Citation and service be issued and made on Defendant Tea Dating Advice, Inc.;

nnn. After due proceedings are had, that this action be certified as a class action pursuant to the provisions of Louisiana Code of Civil Procedure Article 591 *et seq.*, in the respects alleged herein above, for the purposes of determining the common issues of liability for compensatory damages, as well as other common issues;

ooo. Upon certification of the class action, the court call for the formulation of a suitable management plan pursuant to Louisiana law;

ppp. After due proceedings are had, there be a judgment in this matter in favor of Plaintiffs and the Class and against Defendant, for Injunctive Relief prohibiting Defendant from operating the Tea App until proper protections are put in place;

qqq. After due proceedings are had, there be a judgment in this matter in favor of Plaintiffs and the Class and against Defendant, declaring that the Defendant is liable jointly, severally and *in solido,* to Plaintiffs and all members of the Class for all damages arising from the allegations outlined herein;

rrr. The rights of the members of the Class to establish their entitlement to compensatory damages, and the amount thereof, be reserved for determination in their individual actions when appropriate;

sss. Plaintiffs and the Class recover the costs for prosecution of this class action, and for interest on all damages from the date of judicial demand until paid;

ttt. Defendant be ordered to pay all costs and expenses incurred in connection with this matter including, but not limited to, all court costs, deposition costs, expert witness fees for both consulting and retained experts, costs associated with investigation, copies, certified copies, and any and all other expenses and costs incurred during the pendency of this action; and

uuu. Compensatory and punitive damages and monetary sanctions for violations be awarded;

vvv. Restitution and/or disgorgement of funds collected from Plaintiffs and other similarly-situated Class Members be awarded;

www. Attorneys' fees and costs be awarded to the fullest extent permitted under the law;

xxx. Prepetition and post-judgment interest be awarded; and

yyy. This Court award all other general, equitable, and legal relief.

Respectfully submitted,

s/ Lynn E. Swanson
Gladstone N. Jones, III (LA Bar No. 22221)
Lynn E. Swanson (LA Bar No. 22650)
Kevin E. Huddell (LA Bar No. 26930)
Thomas F. Dixon (LA Bar No. 38952)
Rosa E. Acheson (LA Bar No. 39775)
**JONES SWANSON HUDDELL LLC**
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508

**PLEASE SERVE**:

TEA DATING ADVICE, INC.
Through The Louisiana Long Arm Statute
201 Spear Street, Suite 1100
San Francisco, California, 94105